DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Paul McPherson ("McPherson"), appeals the judgment of the Lorain County Court of Common Pleas which found him guilty of six counts of rape, four counts of gross sexual imposition, and two counts of causing a false report of child abuse. This Court affirms.
 I. {¶ 2} On June 15, 2005, McPherson was indicted on one count of rape in violation of R.C. 2907.02(A)(1)(b), a felony in the first degree, and gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree. On June 22, 2005, McPherson was arraigned, and pleaded not guilty to both counts. On June 21, 2006, a supplemental indictment was filed setting forth an additional 28 counts. Included in the 28 additional counts were 14 counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree; 12 counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), felonies of the third degree; and 2 counts of *Page 2 
causing false reports of child abuse or neglect in violation of R.C. 2921.14(A), misdemeanors of the first degree. On June 28, 2006, McPherson was arraigned on the counts in the supplemental indictment, and entered a plea of not guilty to the additional charges.
 {¶ 3} On January 7, 2008, trial commenced. On January 9, 2008, the trial judge consolidated many of the charges in the indictment. On January 10, 2008, the jury found McPherson guilty of all 12 counts on which they were instructed. On March 11, 2008, the trial court, because the jury also made a finding that the act was by force, imposed a life sentence, pursuant to statute, for the 6 counts of rape. The trial court also imposed a sentence of 2 years for each of the four counts of gross sexual imposition to be served concurrently with each other and concurrently with the life sentence, and imposed six months for each of the 2 counts of making a false report of child abuse, also to be served concurrently with each other and with the other sentences. McPherson timely appeals, setting forth 2 assignments of error.
 II. ASSIGNMENT OF ERROR I "THE STATE OF OHIO FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT THAT MR. MCPHERSON COMMITTED ANY OF THE ACTIONS ALLEGED IN THE INDICTMENT THEREBY VIOLATING MR. MCPHERSON'S DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES."
 ASSIGNMENT OF ERROR II "WHETHER THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED WHERE THE EVIDENCE PRESENTED DID NOT DEMONSTRATE THAT MR. MCPHERSON FORCIBLY RAPED AND COMMITTED GROSS SEXUAL IMPOSITION UPON THE MINOR VICTIM." *Page 3 
 {¶ 4} McPherson argues that there was not sufficient evidence to support his conviction on any of the claims in the indictment, and also that the jury's verdict was against the manifest weight of the evidence as to charges for rape and gross sexual imposition. This Court disagrees.
 {¶ 5} This Court has found that the review of the sufficiency of the evidence and a review of the manifest weight of the evidence are distinct legal determinations. State v. Murray, 9th Dist. No. 24217,2008-Ohio-6615, at ¶ 15, citing State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600. When determining the sufficiency of the evidence, it is a determination of whether the State met its burden of production at trial, whereas a manifest weight challenge implies that the State did not meet its burden of persuasion. Murray at ¶ 15, citingGulley, supra. When determining whether the evidence before the trial court was sufficient to sustain a conviction, this Court is to review the evidence in the light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, 279. In addition:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 6} Because sufficient evidence is required to take a case to the jury, the determination that the weight of the evidence supports the conviction will also be dispositive of the issue of sufficiency.State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462. Therefore, we will first address McPherson's weight of the evidence argument, as it is dispositive of the majority of his sufficiency claims.
 {¶ 7} When determining whether a conviction is against the manifest weight of the evidence, this Court has held that courts of appeal: *Page 4 
 "`must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Worrell, 9th Dist. Nos. 23378, 23409, 2007-Ohio-7058, at ¶ 11, quoting State v. Otten (1986), 33 Ohio App.3d 339, 340.
"Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis and internal quotations omitted.) State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Finally, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Murray at ¶ 18, quoting State v.Martin (1983), 20 Ohio App.3d 172,175.
 {¶ 8} R.C. 2907.02(A)(1)(b) states that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.05(A)(4) prohibits sexual contact with another who is not the spouse of the offender when "[t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."
 {¶ 9} At trial, the victim testified that on the night of April 25, 2005, she had been watching a movie with her step-father, McPherson. She testified that while watching the movie, McPherson reached over and put his hand underneath her night gown, moved over her underwear, and put his finger inside her vagina. She testified that McPherson then told her to remove her underwear, and then pulled down his pants, and put his penis in her vagina. She testified that it lasted for "no longer than two minutes[,]" and when asked why, she said "[b]ecause he said that he didn't want to get me pregnant, so he took it out." The victim also *Page 5 
testified that she did not try to fight him off or stop him because she simply thought that might be the right thing to do instead of saying something.
 {¶ 10} The victim further testified that the April 25, 2005 episode was not the first time that McPherson touched her inappropriately. The victim testified that the first instance happened when she was eight years old, and lived in Florida. She testified that he placed his finger in her vagina, and that after the first time it proceeded to happen "just about every night." She also testified that this continued when her family moved back to Ohio and lived with her Grandma, Shirley Smith. She further testified that McPherson was also touching her breasts when they lived with her Grandma, and that it also continued to happen almost every night.
 {¶ 11} The victim testified that she first figured out what McPherson was doing was not right through a program at her school in Florida which talked about what kind of touching was wrong. After this program, the victim testified that she told her mother that "my stepdad [sic] was touching me in the wrong areas[,]" but that her mother told her "she couldn't do anything because she didn't see it." She also testified that she again told her mother that McPherson was touching her in the wrong areas, and that her mother again took no action, but told her that she was "the one who had to say something because it was happening to [her]."
 {¶ 12} The victim further testified that when her family moved out of her grandmother's house and into a house on Seventh Street in Elyria that McPherson continued to place his fingers in her vagina. She testified that it mostly happened at night, that it was occurring about 3 to 4 times a week, and that he was also touching her breasts about once or twice a week. She went on to testify that after they moved to Elyria, McPherson began to put his penis inside her vagina, asked her to perform felatio, and put his tongue in her vagina. She also testified that she again told her mom that he was touching her and that it was "very uncomfortable for me because I was *Page 6 
bleeding." She testified that her mother told her that she needed to say something "because it could be serious[,]" but never took any action.
 {¶ 13} The victim also testified about a letter she had written recanting her accusations. She testified that her mother asked her to write the letter, and that she did it because she missed being at home with her mother and siblings. The victim then testified that the letter was all a lie that she made up in order to go back with her mother.
 {¶ 14} When asked how she felt when she had to remember and talk about the events in question, the victim responded that it made her feel like crying all the time because she now knows that what McPherson did was wrong and he should not have done those things to her.
 {¶ 15} The victim also testified that she had lied initially to the detectives about what actually happened, and that she had even lied at trial during direct examination. She also admitted that she liked it better before McPherson was around and that she would have done just about anything to get McPherson out of the house. She testified that she had lied about certain details because "if I told [other people] that I let him do that, I thought they might think that he didn't rape her or molest her at all. She was asking for it." She later testified when asked why she initially lied and said that it happened less than it actually did, that she felt that "[e]veryone would think why would she let him do it more than once instead of saying something and having it stop the first time." The victim also testified that she had lied about the amount of times she performed felatio on McPherson under oath because she felt weird and scared in front of a big crowd.
 {¶ 16} The State also called Jane Robertson, manager of the Family Care Department at Lorain County Children Services ("LCCS"), to testify. Ms. Robertson testified that she previously held the position of sexual abuse investigator and was responsible for investigating *Page 7 
hundreds of sexual abuse allegations that arose within families. She also testified that she had specialized training in the area of sexual abuse investigation, and had testified as an expert in court approximately 20-30 times.
 {¶ 17} Ms. Robertson testified that children often do not come forward immediately and tell someone that abuse has taken place, and that when a child does disclose information about the alleged sexual abuse "[i]t's not a one-time event[,]" but is a process. Ms. Robertson also testified that embarrassment, guilt and shame often cause a child to refrain from disclosing sexual abuse, and that children worry about what might happen to their family if they tell someone what happened.
 {¶ 18} Ms. Robertson also testified that in instances of family sexual abuse, it is usually not a violent act, and children think that they had something to do with the abuse or wanted it to happen because they did not fight back or resist the abuse. She also testified that the younger the child is that is involved in the abuse, the more likely the child is to believe that such behavior is normal.
 {¶ 19} Ms. Robertson further testified that she "never expect[s] a child to tell [her] everything in [her] first interview with them." She also testified that "in almost all sex allegations children and adults are underreported[,]" meaning that they minimize what actually happened because they feel ashamed and tell "just enough to have it stop." Ms. Robertson also testified that it is not a surprise for victims to recant because that is one of the expected elements or dynamics of abuse. She explained that children will often feel responsible for tearing apart their family and do not like to be separated from their parents.
 {¶ 20} Ms. Robertson testified that when children disclose alleged abuse to a family member and that family member does not take any action, that it will probably prevent that child *Page 8 
from telling another adult about the alleged abuse. She testified that this occurs because the child loses "any faith or trust that an adult would protect them or intervene on behalf of them[.]"
 {¶ 21} Lastly, on cross-examination, Ms. Robertson conceded that kids do lie, but that she had only been lied to during investigations on two occasions. Ms. Robertson also testified that during the course of investigations, the stories of the victims of abuse do not change, but are supplemented by new information such as additional sexual acts not previously disclosed.
 {¶ 22} Shirley Smith, the victim's grandmother, also testified at trial. Ms. Smith testified that the victim, the victim's mother and step-father, the victim's two brothers, and the victim's sister lived with her from the time when they moved back to Ohio from Florida in August of 2003 until July of 2004. Ms. Smith also testified that during the time the family stayed at her home she observed an interaction between McPherson and the victim that she found to be odd or inappropriate. She testified that on one particular morning she had checked on the victim and her sister at around 7:00 a.m. and saw that McPherson "was sitting on the edge of [the victim's] bed and his hands was [sic] going all over her[,]" including touching her breasts. Ms. Smith further testified that after she informed the victim's mother, Laura McPherson, what had happened, she heard Mrs. McPherson confront Mr. McPherson about the incident and specifically heard him say that the child is his daughter, and he is allowed to touch her. Ms. Smith also testified that she did not disclose what she observed to anyone but Mrs. McPherson, and that she never saw it happen again.
 {¶ 23} Ms. Smith also testified that after the alleged incident on April 25, 2005, the victim was brought over to her house, and that for months the victim was very subdued, and that when she was not at school she would stay in her room and only come out for meals and to do chores. *Page 9 
 {¶ 24} Lastly, Ms. Smith testified that while the victim was staying with her after the alleged incident, McPherson would say things in the background while the victim was on the phone with her mother. Ms. Smith testified that the victim was very upset by McPherson's interference. Specifically, Ms. Smith testified that one of the times McPherson was talking in the background during a conversation between the victim and her mother, McPherson accused the victim of having sex with her biological father.
 {¶ 25} Lisa Hatcher, an intake caseworker at LCCS, testified at trial that she had processed an allegation that the victim was being molested by her grandmother's boyfriend which was reported by McPherson. She testified that she spoke with the victim about the accusations and that the victim was surprised about the accusations because nothing inappropriate had happened and she had no complaints. Ms. Hatcher also testified that she had concerns about the allegations after reviewing the LCCS records of the family because she knew that the agency had previously been involved in an investigation of an allegation that McPherson had sexually abused the victim, and that there had also been a previous allegation made by McPherson that the victim's biological father had sexually abused her that was found to be unsubstantiated. Ultimately, Ms. Hatcher testified that, although she never interviewed the victim's brother who purportedly reported the allegation to McPherson, the allegation concerning Ms. Smith's boyfriend was classified as unsubstantiated because there was no evidence of any sexual abuse.
 {¶ 26} Janet Dutton, a protective case worker for LCCS, testified at trial that she "was assigned to the case as a protective worker in May of 2005." Ms. Dutton also testified that after McPherson was indicted on sexual abuse allegations that a no-contact order was issued between him and the alleged child victim, but that McPherson was still having contact with the victim by *Page 10 
making comments in the background while the victim was on the phone with her mother. Ms. Dutton further testified that the victim reported to her that McPherson had accused her of having sex with multiple men, including her biological father. Due to this, Ms. Dutton testified that she addressed the allegations with the victim who adamantly denied them, and spoke with McPherson who acknowledged his contact with the victim, "apologized and said it was inappropriate."
 {¶ 27} Ms. Dutton testified that she also discussed the issue of recanting with the victim around the same time. She testified that the victim had told her that her mother asked her to write a letter recanting her allegations against McPherson. Ms. Dutton testified that she discussed the issue with Mr. and Mrs. McPherson and informed them that they could not discuss anything connected to the criminal trial with the victim. Ms. Dutton further testified that McPherson did not deny such contact had been made. Ms. Dutton later testified that the issue of recanting again resurfaced when McPherson gave Dutton a letter written by the victim recanting her previous statements; however, when Ms. Dutton spoke with the victim about the letter, the victim said that she wrote the letter at her mother's request. Ms. Dutton also testified that the victim told her at Ms. Dutton's final home visit that her mother had again asked her to recant her prior allegations.
 {¶ 28} Ms. Dutton further testified that she investigated McPherson's allegation that the victim had been sexually abused by her biological father. Ms. Dutton testified that the ultimate conclusion of that investigation was that the allegations were unsubstantiated, and that the investigation of the Lorain Police Department yielded the same results.
 {¶ 29} Mrs. McPherson, the victim's mother, testified at trial that her daughter had told her on at least three different occasions that McPherson was touching her. She testified that the *Page 11 
victim first told her this when the family lived in Florida and the victim was around 10 years old. Mrs. McPherson testified that she went straight to McPherson and told him that if she caught him touching the victim that she would "do the worst thing imaginable" to him. However, Mrs. McPherson testified that she did not investigate further or contact Children's Services or the police. Rather, Mrs. McPherson testified that she told her 10-year old daughter that she would have to tell somebody else herself.
 {¶ 30} Mrs. McPherson testified that the victim again told her that McPherson was touching her after the family moved back to Ohio to live with Ms. Smith. Mrs. McPherson testified that this time she told her daughter: "Well, if you don't want to be around him, just tell him to stay away from you." After establishing that the victim was 11 years old at the time, Mrs. McPherson was asked whether the victim "was supposed to say, `Stay away from me, get away from me, don't touch me;' is that right?" Mrs. McPherson responded: "Yes."
 {¶ 31} Mrs. McPherson testified that she remembered Ms. Smith, her mother, telling her that she saw McPherson touching the victim in an odd or inappropriate manner. She also testified that she did nothing about it because she had not caught McPherson in the act, and that she would not believe the victim because of that, and did not believe her at the time of trial "because all she does is lie."
 {¶ 32} Mrs. McPherson also testified that the victim again told her "once or twice" that McPherson was touching her after the family moved out of Ms. Smith's house, and into a house on Seventh Street in Lorain. Mrs. McPherson first testified at trial that the victim did not give her any specifics in regard to how McPherson was touching her. However, Mrs. McPherson eventually conceded that she might have told detectives the day the allegations were made certain specifics that the victim had told her including: "that dad was mad at her because she *Page 12 
wouldn't suck his thing[]"; that the victim "told [her] about a month before that [] McPherson was putting his fingers inside her[]"; that "Dad's trying to have me suck his private area[]"; that the victim told her "that Dad comes and sits on my bed, and if she didn't do it, he would force her legs apart[]"; and that McPherson "comes and sits on her bed and fondles her." When asked in reference to the statements above "[s]o you don't dispute that you told Detective Dietsche those things[,]" Mrs. McPherson replied: "I may have said it, yes. I may have." Mrs. McPherson was then asked whether she wanted to watch the recording of her statement to Detective Dietsche to refresh her memory, but she refused. Then, after she was asked whether she would agree that she said those things, she responded "M-hm."
 {¶ 33} Mrs. McPherson testified that on the night in question she went upstairs to play a game with two of the other children at around 9:00 p.m and did not go downstairs after that. Mrs. McPherson further conceded that she had no idea what happened downstairs on the night in question.
 {¶ 34} Mrs. McPherson also testified that McPherson would talk in the background at times while she was talking to the victim on the phone. Mrs. McPherson also testified that she let McPherson make accusations in the background about the victim having sex with other men even though the accusations had no basis in fact.
 {¶ 35} Mrs. McPherson further testified that the victim told her "[a]bout a week or so or a month or so before this all came about[]" that she wanted McPherson out of the house. She also testified that the victim did not act like she was scared of McPherson, and that the victim had voluntarily stayed downstairs alone with him on the night in question. Mrs. McPherson also testified that the victim had been grounded for about three months at the time of the alleged incident. *Page 13 
 {¶ 36} Ultimately, Mrs. McPherson testified that she would do anything for her husband, but that she would not lie for him. She testified that by following McPherson and the victim she was actually trying to protect McPherson as well because she knew the victim was trying to get him out of the house. However, Mrs. McPherson testified that there was a small part of her that believed the victim.
 {¶ 37} McPherson testified in his own defense at trial as to his recollection of the events on the night in question. He testified that he came home from work, took a bath, ate dinner, went to the library, went to the Dollar Tree, and arrived home at around 7:00 p.m. McPherson testified that he watched a movie with one of his sons and the victim, and that at a quarter to 10:00 p.m. he went upstairs to go to bed. McPherson further testified that when he went upstairs the victim was sitting on his and his wife's bed and that Mrs. McPherson was combing the victim's hair. McPherson also testified that they "bullshitted for a little while and from that point on to about 10:30. And at 10:30 we all said good-night, we love you, and she went in her room." McPherson then testified that "the last thing that happened that night before I went to sleep is my wife gave me a blow job."
 {¶ 38} McPherson testified that there were long standing allegations of sexual abuse against him, but he chose not to leave "[b]ecause the allegations were false and I wanted her to prove them." McPherson testified that Ms. Smith never made any statement concerning her seeing him touching the victim. He testified that he never touched the victim's breasts, that he never put his finger in her vagina, and that he never had sex with her. McPherson also conceded that his rendition of the events on the night in question was different from his wife's, and also that he had never divulged the information about the events that went on upstairs in his bedroom on the night in question prior to trial. Finally, McPherson eventually conceded that Mrs. *Page 14 
McPherson confronted him six months before the authorities got involved about the victim's allegations that he was touching her.
 {¶ 39} This Court has held that in cases where some conflicting evidence may exist, "this Court will not disturb the jury's factual determinations because the jury is in the best position to determine the credibility of the witnesses during trial." State v. Danko, 9th Dist. No. 07CA0070-M, 2008-Ohio-2903, at ¶ 36, citing State v. Crowe, 9th Dist. No. 04CA0098-M, 2005-Ohio-4082, at ¶ 22. Furthermore, "this Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the jury chose to believe certain witnesses' testimony over the testimony of the others." Danko at ¶ 36, citing Crowe at ¶ 22.
 {¶ 40} After a thorough review of the record, this Court cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. Here, the victim testified that she had been touched inappropriately starting when she was 8 years old. The allegations included McPherson's putting his finger in her vagina, putting his mouth on her vagina, touching her bare breasts, putting his penis in her mouth, and putting his penis in her vagina. The victim also testified that she had told her mother about the touching on several different occasions, but that her mother did nothing to help. Mrs. McPherson confirmed that her daughter had complained at least 3 times to her that McPherson was touching her, and also confirmed that her mother, Ms. Smith, had witnessed Mr. McPherson touching the victim's body, including her breasts. While Mrs. McPherson denied at trial that the victim had ever given her any details about the touching, she conceded that she had told one of the investigating officers many explicit details about which the victim had complained.
 {¶ 41} The victim conceded during her testimony that she had in fact lied to the investigating officers during her initial interview, and that she had lied during her direct *Page 15 
testimony during trial. However, Jane Robertson, an employee of LCCS, testified that the victim's behavior in minimizing what happened between her and McPherson was something that was very common in child sexual abuse cases. Ms. Robertson also provided that disclosure of information is not a one time event, and that she never expects to get all of the information and details in the first meeting. Ms. Robertson also testified that recanting is a normal, expected element of the process because children often feel responsible for breaking up the family.
 {¶ 42} Although there may be some conflicting evidence, it cannot be said that this is the exceptional case in which the evidence weighs heavily against McPherson's conviction, warranting its reversal. Therefore, McPherson's conviction is not against the manifest weight of the evidence. Accordingly, McPherson's second assignment of error is overruled.
 {¶ 43} While McPherson claimed that the jury verdict was against the manifest weight of the evidence as to whether he forcibly raped and committed gross sexual imposition upon the victim, he did not claim that the verdict was against the manifest weight of the evidence as to the charges in counts 11 and 12, causing a false report of child abuse or neglect. Having concluded that the trial court's ruling was not against the manifest weight of the evidence as to counts 1-10, McPherson's sufficiency claims as to counts 1-10 also fail.
 {¶ 44} McPherson also claims that "the State failed to meet its burden as a result of in [sic] the introduction of testimony of alleged prior bad acts by Mr. McPherson to [the victim] in the State of Florida." McPherson argues that the State failed to introduce sufficient evidence-like police reports — to show he committed the prior bad acts. McPherson did not separately assign as error anything related to the State's use of prior bad acts in its case. This Court may decline to address any alleged error where the appellant has failed to separately assign and discuss the alleged error in compliance with App. R. 16.Rusov v. Ansley, 9th Dist. No. 23748, *Page 16 2007-Ohio-7022, at ¶ 7. McPherson's argument regarding the admission of prior bad acts evidence is outside the scope of his assigned error; accordingly, this Court need not address it. Id. To the extent his challenge is to the State's failure to introduce sufficient evidence to prove his prior bad acts, assuming he is correct, that failure would have no effect on whether the State introduced sufficient evidence to prove the elements of the offenses for which he was convicted in this case.
 {¶ 45} In regard to McPherson's sufficiency claims as to the 2 counts of causing a false report of child abuse or neglect, two witnesses testified that McPherson had made multiple unsubstantiated allegations involving different men having inappropriate sexual encounters with the victim. According to R.C. 2921.14, a person is guilty of making or causing a false report of child abuse where an individual "knowingly make[s] * * * a false report * * * alleging that any person has committed an act or omission that resulted in a child being an abused child[.]" R.C. 2921.14(A). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
 {¶ 46} The first witness was Lisa Hatcher, the intake worker assigned to investigate the allegation made by Mr. McPherson involving Ms. Smith's live-in boyfriend, and the second was Janet Dutton, the protective worker assigned to the McPherson family. Both witnesses testified that allegations made by McPherson involving the sexual abuse of the victim were unsupported by evidence and adamantly denied by the victim. In addition, McPherson's own wife acknowledged during her testimony that the allegations of sexual abuse made by her husband had no basis in fact. *Page 17 
 {¶ 47} After viewing the evidence in a light most favorable to the prosecution, this Court cannot say that no "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks, 61 Ohio St.3d at paragraph two of the syllabus. Accordingly, McPherson's first assignment of error is overruled.
 III. {¶ 48} McPherson's two assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant. *Page 18 
Dickinson, P. J., and Slaby, J., Concur. *Page 1